Good morning, everyone. The first argued case this morning is No. 14-5082, Zoltek Corp. v. United States. Mr. Manko. Good morning, Your Honors. Dean Manko on behalf of Pellin Zoltek Corp. may it please the Court. Your Honors, the Court of Federal Claims, the CFC, has repeated failure to apply or even mention the burden of proof regarding the evidence presented both regarding Sections 103 and 112 warrants reversal. There is no empirical evidence in the record that the government's expert rule of mixtures methodology could reproduce the preferred embodiment carbon fiber sheet product described in the Zoltek patent. Mr. Manko, it is your impression that the trial judge concentrated on that Figure 4? Absolutely, Your Honor. In fact, Your Honor, it was not only mentioned in the opinion itself, but it was mentioned in denying the government's motion for summary judgment. The Court's opinion used similar language. It said it was a remarkable congruence. And that was found at 95 Federal Claims 681-698. So it's repeating the same thing. Is the question, in fact, how much of the data in that figure were in the prior art? Is that the issue with that figure? Yes, Your Honor. The whole problem with the expert's case is that he's relying on the Zoltek patent and the data that generates on the Zoltek patent. But a lot of the information in the Zoltek patent is in the prior art and the patent says so. It is with regard to volume resistivity, Your Honors, but not surface resistivities. There's no document that they presented that even mentioned surface resistivity, let alone the data points that were provided for in the curve that Dr. Sullivan created. There's no document. Prior to 1984, there's no document. The judge seemed to think that the process had been practiced and that the only problem was that the resistivity hadn't been measured. Is that a fair statement? The process that had been practiced is generating volume resistivities for fibers based on a heat treatment process. But the idea of controlling surface resistivity by controlling volume resistivity had never been done before. It had never been done. So you have the heat treatment process. Yes, that was in the prior art. We admit that it's in the prior art as far as generating the curve that's shown in Figure 3 for a single fiber. But as far as controlling the surface resistivity of a sheet product based on controlling the volume resistivity of a single fiber had never been done before. It had never been done. And Dr. Sullivan, in going through his mathematical methodology, substituted the use of weight percent for a volume fraction from Zoltec's 2000 User's Guide for his most important component. So now you're mixing up the physical parameters between weight and volume and he's using them interchangeably and there's no scientific evidence that those can be interchanged. And that was a glaring error. Is this the 1% number that you're talking about? Is this the 1% issue? Exactly. In the patent, that's 1% by weight. I'm sorry, it's 83% by weight in the patent as described for the carbon fibers. I'm not exactly sure what the 1% is. Oh, yes, that's the resin volume fraction. That's the resin volume fraction, Your Honor. So Dr. Sullivan, in essence, used the wrong numbers to get the result that he wanted. But didn't at trial, didn't Zoltec argue that the correct fiber volume fraction that he should have used was in fact 3%? 3%, correct. But now you're saying, no, it should have been, he used 30%. He used 30%. And now you're saying, no, it should have been 83% on a pencil. Your Honor, again. I feel like there's a little bit of a moving target. It's almost like whack-a-mole on the theory here. Here's where things got confused, and this is where Dr. Sullivan's confusion came, mixing weight percent and volume percent. The 83% in the patent, that is a weight percent. The 3% is the volume fraction. And, Your Honor, if I may invite the Court's attention to Column 6 of the patent. It's on A39, and I think it's lines 48 to 52. It talks about an area that's one-half ounce and one ounce per square yard. So let's just say we have this table. It's about three feet here by three feet here. So we have this sheet laid out on it, and it has 83% by weight carbon fiber. But if you look at that, how is that going to be one ounce and one half ounce? One half ounce is extremely small weight percent. I mean, it would be difficult for a human to even measure, to even be able to tell a one ounce weight. This is the whole problem in the case. Dr. Sullivan was mixing weight percent and volume fractions. And so he selected out of the Zoltec 2000 User's Guide a weight percent of 30%. And he himself, if I may just go directly to his testimonies and answer the question, he testified, the far left-hand column, and again, this is referring now to the Zoltec 2000 User's Guide. Quote, the far left-hand column shows a range of fiber components in weight percent ranging from zero to 40. I selected 30%. It was somewhat arbitrary. I don't actually know because it's not reported in the patent. So he selected 30% from a range between what the document identified as zero weight percent to 40%. Now, that's an enormous range. Well, it's an enormous range, but I guess the question is, what would one of skill in the art have done, right? Would one of skill in the art have been motivated to make these selections, to make these choices? He selected 30%, and then maybe he can't justify exactly why, but maybe that isn't that evidence of what one of skill in the art would have selected if they were trying to relocate? Your Honor, there's no evidence in the record that a person of ordinary skill in the art would even know what the volume fraction was of a sheet product as described in the preferred embodiment of the Zoltec patent. This is all new territory. This is why when you look at what the letter from George Rogers describing the product as being unique, and they had never seen it before and were not aware of any manufacturer that could produce such a sheet product. Now, that was a contemporaneous document that was written in 1987, and it was written and filed to support an amendment which overcame a rejection for obviousness, and he knew why he was writing the letter. Can you step back for me for just a second? Because, I mean, although it's a bit confusing for me, I understand that what a lot of your brief has done is point out what you think are flaws in the methodology of the calculations performed by Dr. Sullivan, that he chose wrong numbers or we don't know why he chose numbers he chose or what is it that you think that all of these things show us? Why are these individual issues something that causes us to reverse? Is it because you think he should have been doberted and not allowed in, he wasn't qualified? Is it that his methodology is so flawed it is clearly erroneous to rely upon it? And once it's out, it should have been actually excluded or rejected by the – precisely what is the nature of the legal argument that you are making to us about what we should do with these flaws? We argued that he should not have been allowed to testify because he's not qualified, but putting that to the side. But that's not the issue. You're not appealing. There's no empirical evidence that it could work. If you take a look, Zolt Rumi testified on the witness stand. So is your argument – I just want to make sure I understand. Is your argument that the failure of their proof on obviousness and the critical error that you see in the district court's adoption of this view is that Mr. Sullivan, the evidence presented, including Mr. Sullivan's testimony, fails to show empirically that it will work? I want to understand precisely this point. It will not work empirically for two reasons. Number one – What's the if? It would not work? I'm sorry? You say there's no empirical evidence that it would work. What's the if? His rule of mixtures methodology would not work and it would not be used by a person of ordinary skill in the art. That's why it's never been used. He couldn't identify anybody that's used it over the past 40 years. It would not work to produce – It would not produce the preferred environment. It would produce the figure four. Correct. Your Honor, the problem is twofold. Number one, he can't – he's off by an order of magnitude as 3% volume fraction versus 30% volume fraction. That's number one. Number two, Mr. Rumi specifically testified you can't make this product with that kind of a volume – with that kind of a volume fraction because he said you'd wind up having to compress the fibers together because it would defeat the entire purpose of it. That's why it couldn't work. And this Court – the case that really to focus on, if I may suggest to the Court, is Liebes versus the United States. This Court's decision specifically stated, quote, Do they – can I ask you, is the standard in your view that Mr. Sullivan had to demonstrate that he was able to replicate and make it, quote, work? Yes. With his data, he had to make it work. This is an empirical science. Organic chemistry is an empirical – But why? I mean, obviousness requires – I may say this wrong in light of KSR, but a motivation to combine. You know, let's just say it requires something like that. It doesn't say that you have to demonstrate that it would work. If anything, isn't the standard under our precedent a reasonable expectation that you would have success? Exactly, Your Honor. But in the area of organic chemistry, I'd invite the Court to Liebes versus the United States. There were four factors that were identified, and the Court said specifically that factors – four factors primarily applicable are when the question involves the technical process with the reliability, and it's scientific reliability. It's not merely general acceptance. It's scientific reliability of the technical methodology has been raised. And when that issue is raised – and I'm talking – here we are at 193 up third at 1367. When that happens, there are four factors that come into play. The testability of the hypothesis. Dr. Sullivan's hypothesis that he could have used the rule of mixtures certainly could have been tested. He never did it. He doesn't know anybody that ever used it before. And, in fact, that dovetails with Zolt Rumi's testimony, which he says, I know of nobody that's used this mathematical methodology in 40 years to produce the product – the preferred embodiment in the past. Secondly, has the methodology been peer-reviewed and published? And the answer to that question is absolutely not. There's no evidence in the record that – See, this feels like a Daubert challenge. That's why I'm – when I'm having trouble, I understand your precise argument about flaws that you see in the methodology he used. But what I don't understand is how you are extrapolating those precise, very fact-component issues into a reversal in your favor. I don't understand the legal principle. What you're saying now about methodology feels to me like a Daubert challenge. But that's not what you did. In essence, it is. I mean, we filed a Daubert challenge to him, and that was rejected by the Court of Federal Claims. You said that's not what you're appealing here. So what is the – can you articulate for me one more time, and maybe it's my density, I'm sorry, but the legal argument. Where did the Court go wrong in its obvious misconclusion? Where do these factual problems – Failure to require that it worked. It's as simple as that. There's no – I don't understand how it worked as a requirement. But he produced the sheet product in the past. It worked on the numbers that he plugged in to the rule of mixtures. It did. That's right. So you're arguing that – I think you're arguing that Judge Dammock committed clear error in a matter of fact-finding when he found that the elements that were plugged into the rule of mixtures were the correct factors. Exactly. I think that's your argument. He substituted – he allowed – in fact, if you look at Judge Dammock – that there's no error in law. The judge understood the law of obviousness, but the judge made clear error fact-findings when he plugged his factors into the rule of mixtures. Well, there was error in Dr. Sullivan's using a weight percent instead of a body fraction. That's what you're saying. That's Dr. Sullivan's error. But then that led to a whole cascade of errors, starting with the fact that he used bogus data points to create a curve so that it overlaid – In some instances, he's using – as I read what Judge Dammock was saying, he's saying even using your numbers, your client's numbers, when he plugs it into the rule of mixtures, he comes up with the same result. The Judge Dammock was referring, I believe, to the density issue, and that's not – that figures into the rule of mixtures. But the primary error here – and I disagree with the judge, and I think we showed that he disagreed with the judge. But the primary error here is that Dr. Sullivan used a weight percent, not a volume fraction. And Dr. Sullivan's own rule of mixtures methodology required the use of the volume fraction, not the weight percent. Those are two different physical parameters. And that, of course, he used the wrong numbers to generate the curve, which overlaid – And you think Judge Dammock was unaware of this, or he was aware of it and had an explanation? Your Honor, the opinion of Judge Dammock does not even mention this in the opinion. Judge Dammock's opinion does not mention Zoltec's 2,000 users guide and the fact that he was using a weight percent admittedly. I mean, there's no question about it. He used a weight percent, and he said so on the witness stand, and as we stated in our briefs. Well, so then can I ask you, is this the blind squirrel finds a nut? I mean, how did he get the – you're saying he used the word? He worked backwards, Your Honor. He looked at – he took the patent, and he just simply worked backwards. It's a very egregious case of hindsight. Because if the standard is that you take a look at – That's a different issue. Say again, please. That's a different issue. That's saying that the factors that he plugged into the rule of mixtures did produce Figure 4. Well, the factors that he plugged in, he relied on a weight percent and not a volume fraction. There are no volume fractions in Zoltec's patent. It is all weight percents. So that if he – the weight percent for the carbon fiber in the patent, in Column 6 of the patent, is 83 percent. And yet he uses 30 percent. He just picks and chooses numbers that he wants to reach the result that he obtained. That's the whole problem here. Let's hear from the government. We'll save you rebuttal time. We will pursue this with the other side. Thank you very much, Your Honors. Okay. Thank you, Mr. Markoff. Mr. Hoskin. May it please the Court, Your Honor. It does seem strange, does it not, that your expert used a good deal of the data that he used was data that was generated either after the filing date or that was not specific in the sources that he selected it from. Is that correct? We would agree with at least some of that, Your Honor. I think the problem here is that this all goes back to Figure 4. Let's talk about the source of the data in Figure 4 because this, to me, seems to be a particularly troubling aspect. Obviousness is the information that was available before the filing date, not after, and yet they use this plaintiff's own documents either from the patent itself or produced after the filing date and use this as a basis for obviousness. Well, Your Honor, first let me address the problem. Part of the problem with the data in the patent is that it's very incomplete. Zoltek says that that's... That doesn't justify using it as ground for something that is necessarily based on what was known before the invention was made. Well, Your Honor, I think that all that the rule of mixtures was designed, all of that testimony was designed to do one thing, and that is to show how you get the relationship between the single fiber and the volume resistivity of the sheet. But that relationship had to be known at least from the viewpoint of providing certain background before the filing date and that the data that was used was all produced after the filing date. Some was before, some was after, Your Honor. But if I could step back a minute, the basic concept of making a sheet product and controlling the resistivity of that sheet product were known before the filing date. Leighton did it. In the Leighton patent, there are two examples of sheet products made where the fibers are produced at temperatures of 1,000 degrees and 1,250 degrees, and he goes... The carbon fibers were known before. And the ability to control the volume resistivity of the sheet was also known. Now, and that's also shown in Top Chap. And the ability to control the resistivity generally was known. Now, Dr. Sullivan also testified that going from volume resistivity to surface resistance in ohms per square is a very simple calculation. It's just the volume resistivity divided by the thickness of the sheet. Can we not get too far away from what I thought was Zoltec's position, a dispositive position for air below? I understood Zoltec to be saying that if you ran the rule of mixtures correctly and you produced figure four as a result of it, well, then you'd have a problem. He'd have a problem with objects. But he's saying the expert who ran the rule of mixtures made a fatal error when he used a weight percentage instead of a volume percentage. He said that's a fatal error, and if we agree that that's a fatal error, then the running of the test is no good and the result would be wrong. So why don't you directly address why it was proper for your expert to ignore the weight percentage and use volume? Well, the rule of mixtures requires the use of volume percentages. Yes. And Dr. Sullivan... Did he use volume? Yes. He testified that in his experience, the volume percentage should be around 30%. Now, he also then said that this user's guide was one of the references that he relied on, but he said, but what... How does that correlate to volume? I mean, how does it correlate to weight? The user guide is in weight, Your Honor, percentages. Dr. Sullivan, though, said that he testified that it has to be in volume percentage. Because? Because... You're not helping me. I mean, maybe I have a very simple-minded way of looking at the case. The rule of mixtures works on the presumption that if you started with a block of material, it would occupy a certain volume, and you measure the resistivity of that, or the resistance of that volume. When you have a mixture, such as we do here, you have, say, resin, which is a non-conductive material. You have the fiber, which is very conductive. So, as Dr. Sullivan testified, the key element in that is how much fiber there is in the mixture. And that will pretty much determine the conductivity of the material. Do you measure that by weight? Excuse me? How do you measure that amount, by weight? No, you measure it by volume. For instance, in Joint Exhibit 37, a major exhibit in this litigation, Mr. Boyd actually did volume calculations for sheets. But it's how much of the volume that the sheet occupies is fiber versus other material, essentially. And Dr. Sullivan, the part of Dr. Sullivan's testimony that the court credited, was that in Dr. Sullivan's experience, the volume percent should be around 30%. And then, Judge Damage also credited Joint Exhibit 37, which then has ranges from 15% to 35% in volume fraction. Well, I have to interrupt you, because the question is not what, in his experience, 20 years later, is an appropriate percentage, but what was shown in the prior art to be appropriate at the time this invention was made. See, that keeps cropping up. Everything you look at, he uses numbers from the inventor's specification. He uses numbers from their brochure and literature produced after the patent application was filed. And it's very hard to find, except some of what was in his calculation, you could find in the prior art, but not enough to produce that entire curve. Well, the volume percentage, now the part that, again, that Judge Damage credited, is the volume percentage testimony relating to Joint Exhibit 37, which is Mr. Boyd's own work and was contemporaneous with the invention. He used the inventor's numbers, and whether that's legitimate prior art is another question, because they were published generally some before, some after. Yes, Your Honor. If you just cut things off at the time that this invention was made, it's very hard, at least it was very hard for me, to find enough figures to produce that curve reliably. I think that, Your Honor, yes, if you are trying to actually replicate the curve, there is not enough information. Well, the Judge Damage relied heavily on that curve. That's the problem. He relied on the relationship that the curve shows and why that relationship exists. The basic concept here, and all that's new in the Zoltec patent, the only thing that's ever been claimed to be new is this ability to pre-select based on fiber resistivity and get a surface resistance. The government showed that at least two other people had done the same thing, although not in a curve relationship, but at specific points. We showed that through an article by Fischbach and Kamaki, that the fiber volume curve was well known. But none of that is what Judge Damage relied on for his conclusion. He relied on Dr. Sullivan. And I think that what seems to be troubling Judge Newman is the same thing that's troubling me, which is I don't understand where Dr. Sullivan got some of the data that he used to so beautifully replicate that figure that Judge Damage liked so much because it was practically identical to the figure in the patent. And that really wrapped this case up with a nice pink ribbon. I mean, it was just sort of, where did the 30% number come from? Because what you said represented to us, and I wrote it down here, was that he said he chose 30% based on his experience. But in fact, the only evidence I can find on 2259 of the appendix, he said, I chose 30% because the Zoltec user guide gave a range of 0 to 40. I chose 30% – here's the quote. It was somewhat arbitrary. The Zoltec user guide is from the year 2000. That is Zoltec post-patent data. We don't disagree with that, Your Honor. So if he's choosing all these numbers to show, oh, see, this was known in the art, but he's actually using post-dated stuff that one of skill in the art would not have known or that you didn't show one of skill in the art would know at the relevant time for the obviousness inquiry, why is that not riddled with hindsight-related problems? Well, Your Honor, I think that, yes, there was an element here where he was trying to replicate the data. I think that that misses some of the points that Dr. Sullivan was doing, though. He also tested the rule of mixtures formula against the Leighton patent data, which is definitely prior art, against the Topchev data, which is also prior art. Tested it for what purpose? For the purpose of demonstrating that the rule of mixtures worked in those cases as well. But working in those cases is different from working in this case when what you're trying to do is replicate a specific graph. And you need inputs into the formula. Those were examples. What inputs were used in the other examples? In the other examples where you say, well, he used this rule in other cases. Well, no, he was saying that he tested it against, actually, three data points. Two from Leighton and one from the Topchev patent to demonstrate that, yes, it worked there. Those three sheets that are described in those two references are also partially carbonized fibers. Was he using this 30% figure in those equations? No. That I do not, I don't know what the percentages were. That's what I'm saying. You're getting away from it. We're talking about the application of this particular rule in a very specific case and whether it was correct. I understand that, Your Honor. The fact that the rule may have been properly applied in a different parameter doesn't seem to me to be relevant. Well, I think that the rule works in all cases. It applies to all cases and it applies not only to electrical resistivity but to many other factors. The problem or the distinction here is at some point in time- Let me ask you a simple question. Let's assume that the court concluded that it was error for Dr. Sullivan to use the 30%. What's that do to your case? It undoes it, doesn't it? Well, it would be a problem, yes. But on the other side, there is no evidence. In this case, Zoltec put on no evidence. That 3% number, there's nothing that supports that. Well, did they challenge the 30% below? They did challenge the 30% by saying that it should be 3%. There's no evidence of 3%. Is it their burden to come up with a correct number? You're trying to invalidate the patent. Well, you know- Why is it their burden to come up with the right number to go into the rule? I'm not sure that it is here. I would never say that it's their burden. Come back to whether or not 30% was- If we decide 30% was incorrect because it was just picked out of the air from a document that existed after the filing of the patent, then we reverse, right? You certainly could reverse. I don't think you have to reverse. How could you know? Well, first, the standard here is clear error. I'm not sure that that is necessary. Depending on what the court's other findings are as to the totality of the evidence- Well, 30% has to predate the filing of the patent. Well, let me go back and reiterate, Your Honor, that Judge Damage did not rely on the user guide portion of it. He relied on Dr. Sullivan's experience, the testimony that Dr. Sullivan- Well, Judge Moore pretty much chased that, as you said. Well, no, I think there is other testimony in the record relating to Dr. Sullivan, and I think there is a specific reference where Judge Damage actually cites where Dr. Sullivan says that he was basing the 30% number on his experience. And Dr. Sullivan is an experienced person in this art. Validity depends on what's in the prior art, not on some super smart expert 20 years later. We understand that, Your Honor. But we're not saying that the rule of mixtures was certainly in the prior art. We're not saying that the numbers are particularly critical here in the sense- All we're using the rule of mixtures for is to explain why there is a mathematical relationship between that single fiber curve and those two sheet curves. And that's all that it's trying to do. This is simply a relationship built on fractions. And once you understand that the fraction of the volume that is occupied by the conductive material, then you can figure out exactly why the relationship exists. But somebody has to do it. When you say you have to figure it out, somebody has to figure it out. Somebody has to run an equation and some numbers to get the job done. And Layden and Topchev, for instance, did that. And they presented examples of sheet products made within the ranges of what DOLTEC is claiming. They just didn't show the entire range. But were they products that were available before this patent application was filed? Both Layden and Topchev were patents that were issued before this patent application was filed. You say the patents. I thought you were telling us that they were products. Well, the product was the- my error, Your Honor, the material that is described in the patent. These are both patents. These are both issued patents. Any more questions for the government? Any more questions? Okay. I think we have the petition, Mr. Hausman. And Mr. Monko, you have the rebuttal. Your Honor, it's just a couple of quick points. First of all, with regard to the Layden and the Topchev patent, neither one of those patents mentioned the term surface resistivity. That's an admitted fact. There's no question about it. Second of all, Dr. Sullivan testified that the Layden and the Topchev patent would not be sufficient to render the DOLTEC patent obvious. That's also Dr. Sullivan's testimony. So the reference to the Layden and Topchev patents are of no consequence here. Second of all, with regard to Exhibit 37.9, which is the DOLTEC chart that Mr. Hoskin referred to, that is a chart for a multilayered laminate made of a multiplicity of sheet products that are saturated with resin and pressed together. It is not the single sheet product in the preferred embodiment of the patent and has no relevance whatsoever to that. And number three, Mr. Hoskin in his response to the court was referring to a block of material. This is where you use the rule of mixtures in a block of material. The preferred embodiment in the patent is a web. It's a web. It's not a block of material. There is no evidence in the record to specifically address Judge Moore's point. There's no evidence in the record that a person of ordinary skill in the art would look to the rule of mixtures to recreate the web-based sheet that's in the patent and the preferred embodiment. That's our rebuttal. Thank you very much. Thank you. Thank you both. The case is taken under submission.